Good morning. My name is David Lowery of Train on behalf of the appellant in this case. Normally in a social security case we get an ALJ decision that's 7, 8, 10 pages long and in this case we have one that's 45 pages long. And it's quite something to read. Some years ago the Commissioner of Social Security proposed rules for representatives and one of those rules was that representatives would be required to turn in all evidence whether favorable to their clients or unfavorable to their clients. Following a comment period where comments were received from various parties including the American Bar Association and the National Organization of Social Security Claimants Representatives, that rule was not adopted and the agency took the position that representatives had the duty to prove disability rather than ability and therefore our duty was to submit whatever claimants wanted submitted on behalf of their case. When this first hearing in this case opened ALJ Madden began by saying he'd have trouble with representatives withholding evidence from him and proceeded to ask me about that subject. That resulted in the hearing being very short and we never got any testimony. And it becomes obvious from reading the transcript of that and the decision itself that Judge Madden is mad that the agency did not agree with the position he likes which would be that representatives turn in everything whether favorable or unfavorable. And he's mad at me and other lawyers apparently and does not accept the decision of the agency and figures we ought to give it to him anyway notwithstanding the agency's position. That resulted in me ultimately having to file a mandamus action to get the case to hearing and after the government's motion to dismiss was denied then he decided to schedule a case for hearing. There are a lot of things that could be said in ten minutes wouldn't even begin to cover this but I can hit a few highlights. Almost right off the bat in the decision I think it starts at page 42 of the transcript he criticizes me for submitting statements filled out by witnesses. Following this court's decision in the Schneider case it became possible for us to utilize witness testimony to help prove that people meet or equal the listings and therefore it became prudent practically malpractice not to do that. So I got witness statements that covered the B criteria of the mental listings and people filled them out. Oh what a bad lawyer I am and he spends quite a bit of time trashing me for doing such a terrible thing. Those witness statements began at 453 in the transcript through page 466 and there are some others that appear in page 476 through 497. Those witness statements later get taken as true by Judge Madden. He has a real clever way of dealing with them. Page 76 and 7 is a very clever way of dealing with them. Well it might be a dangerous way too. There are some examples of this. Transcript page 76 he quotes Ms. Ginsburg one of the witnesses is saying of the claimant she is rude in stores and yells over the voices of other customers to get a cashier's attention. She is loud and uses inappropriate language at work settings. She is unpleasant in conversation due to her need to constantly talk about herself. While Ms. Ginsburg's assertion in this regard is accepted as truthful descriptions of the claimant's unfortunate personal behavior choices she has not described work related limitations that are a function of a medically determinable mental impairment. Later on the page he discusses the same thing with regard to another witness and on the next page as well. In choosing to say that these are just unfortunate personal behavioral choices rather than a medically determinable impairment the AOJ has neglected to point out that he has already determined the claimant has a personality disorder. And because the claimant has a personality disorder these behaviors occur. And while he's accepted the personality disorder he doesn't want to admit that that's why all this happens. But he has accepted the statements as being truthful. So one way to resolve this case would be just to say the judge neglected to connect the behavior with a personality disorder. He accepted the statements as true. The claimant meets the beak rights area and so under the Schneider case the claimant wins and the case should be remanded for the payment of benefits. I might also point out that there are currently pending for comment new proposed rules by the commissioner. I think the comment period closes later this week where the theory of the Schneider case is accepted and they're proposing to amend the Code of Federal Regulations to provide that we will accept witness evidence to help determine whether somebody equals the listings. On page 53 in the decision the judge attacks the chiropractor Dr. Freeman. Dr. Freeman's resume appears at page 878. Dr. Freeman's resume reveals that he went to Western State's chiropractic here in Portland, graduated as class valedictorian, got a master's in public health focused on epidemiology at Oregon State, later got a Ph.D. in epidemiology at Oregon State, went to Northwestern University to study auto accident reconstruction. You have an auto accident in this case and is currently, as of that time, three-fourths of the way through an M.D. degree. So having a doctorate in chiropractic medicine as well as epidemiology, master's in public health, very close to an M.D. degree in medicine, he's probably the most highly qualified chiropractor this ALJ will ever deal with. An ideal person for the claimant to go to. But all he does throughout the decision is attack Dr. Freeman because what Dr. Freeman did was listen to the patient, examine the patient, treat the patient, and agree that she was in really bad shape, which does not help denying the claim. On page 54 of the decision he exploits the fact that the claimant at one point told the therapist she spent three hours standing in a concert. This appears at page 685 in the transcript. He neglects to point out that she also told the therapist that made her leg worse the next day. There's some significance to that because his hypothetical to the vocational expert in this case called for medium-level work. And even at light-level work, you have to be able to stand and walk for six hours out of an eight-hour day. If her experience was that... Well, can we come back to Dr. Freeman so I can understand exactly what your point is? Because having gone through all of these statements that you referred to about the qualifications, is it unnecessary to refute the extraordinary limitations identified by Dr. Freeman in detail around due to his lack of qualifying medical expertise and the utter absence of any political evidence that could support his wide-ranging assertions, even if he were an acceptable medical source? Now, you said, well, Dr. Freeman made the mistake of listening to the claimant, but was there any clinical evidence to support the observation? I mean, that's not an unfamiliar rubric for ALJs to say, well, I hear what the medical expert's saying, but it's all based on just interviewing with them and talking to the claimant, and particularly in a mental area, where's the clinical backup to support the subjective evaluation? Well, that's one of the reasons why the judge should do what SSR 96-5P says, recontact a physician for those things you don't understand to find out what the basis for it is. Okay, so you've made that argument before in another case, but the question is as to is that the only way to impeach or the ALJ's conclusion here, that he didn't fill in the record because, in fact, on its face, there was a substantial reason or adequate reason under the law and the regulations to reject Dr. Freeman's analysis, since there were no clinical findings? Yeah, well, assuming there were, I think you have to start out at the beginning in saying that doctors will say these things based on what they know about medicine and what they know about their patients. The judge has asked you not to assume there were clinical evidence, but to point to the clinical evidence. There is none. He just needs to recontact the doctor in order to find out what the basis is. But if the doctor is simply saying the basis of my findings are what the patient tells me, you don't have to recontact the doctor to find out what the basis of the doctor's conclusion is. The doctor might also say if you were recontacted in medicine, such and such things are so, so that what the patient tells me is consistent with my examination of the patient. And I'm out of time. Okay. Didn't cover anywhere near what I wanted to. Thank you. Good morning, Your Honors. May it please the Court. Joanne D'Antonio on behalf of the Commissioner of Social Security. The issue that stands out in this case is the ALJ's finding that Ms. Bayless' subjective statements about her symptoms were not entitled to essentially any evidentiary weight. Ms. Bayless has assigned no error to this finding. This finding is critical because it affects the evaluation of all the other evidence as presented in this case to which error has been assigned. That's the evaluation of the medical opinions, the evaluation of the lay witness statements, and in particular the evaluation of Ms. Bayless' RFC, or residual functional capacity. That's the issue I'd like to address because that is the critical issue, whether or not the ALJ's RFC finding was supported by substantial evidence. The ALJ found that she had the RFC to perform light work, but limited to no complex duties or instructions, no requirements to work as a member of a team, and no frequent public contact. He basically gave those as a concession to her. In determining the RFC, the ALJ need only consider what is credible, and he outlined those claim limitations that he found did not exist. So here, because the ALJ included all the limits found to exist, and because its findings were supported by substantial evidence, the case of Rollins states that this is the correct RFC, or that it is supported by substantial evidence. The next issue that's been raised by counsel is the evaluation of the reports of Dr. Freeman, and as the court has noted, there was no clinical basis for basically any of his findings, particularly the psychological findings regarding her ADD and that she's essentially incapacitated. Dr. Freeman is a chiropractor, and essentially he accepts basically what she said, and that is the problem with the evidence that plaintiff relies on in this case. Most of the evidence that he relies on to support his contest of the ALJ's findings is that which is based on the lack of credibility, or is based on the statements of the plaintiff, which in this case have been found to lack credibility. Okay. Apart from the customary Social Security issues that you're addressing, I would appreciate it if you would also address at some point in your argument the due process contentions that are raised in this case. There's evidence that the ALJ and counsel for Bayless had some history, and there were allegations asserted in the briefing that due process was denied. I would like to hear more from the government on that. I will address that issue. The case of Lickey tells us that judicial remarks that are critical, disapproving, or hostile to counsel, the parties or their cases do not suggest a bias challenge. They do not support a bias challenge, and that's at page 555 of that decision. Prior to this case, there was no history between Mr. Lowry and Judge Madden. As the record reveals, Judge Madden stated that other attorneys other than you, Mr. Lowry, have been known to basically withhold what would be detrimental evidence to their client. So there was no history there. In this case, well, in any case, the claimant has to show that the ALJ engaged in conduct that was so extreme it deprived her hearing of fundamental fairness. The issue that's bothering me is exactly what does the evidence show on that? In other words, did the ALJ properly focus on Bayless' disability, or was the ALJ's concern about Bayless' counsel such that there's an error of due process? Well, one thing that I'll point out that Mr. Lowry pointed out, this was a 45-page decision, which is almost unprecedented. In this decision, he addressed every single piece of evidence. I couldn't find any that he did not address, and that's definitely something that has not been contended that he missed one piece of evidence or did not evaluate it. The only thing that's being contested is that he didn't evaluate it the way they would have liked it. So throughout this, the ALJ gives the appropriate, either specific and legitimate or clear and convincing reasons to reject the information or reject the evidence that's been presented. There is, when I counted, almost 40 pages that the ALJ goes through that shows the inconsistencies and the theatrics of Ms. Bayless that are just too numerous to go through at this point. But one of the examples is the onset of this is August of 1998. At that time, she had a minor accident. She suffered a sprain to her right ankle with possible micro fracture. She was released to light duty. Doctors could find no objective findings to support these allegations of pain. She was referred to physical therapy. The physical therapist essentially kicked her out because she refused to participate, and her pain behavior was so extreme that they just didn't believe her. She would not get full effort on testing. By the time this gets around to closer to the hearing where she's going to evaluators referred to, that she's referred to by Mr. Lowry, that minor accident has now caused a complete disruption of her life. She has back pain. She has neck pain. She has headaches. She has PTSD. She has depression so severe she doesn't get out. All of these allegations are very, in very much detail, disputed by the ALJ, shown the numerous inconsistencies in this statement. At one point she alleges that she socially isolates, but she's basically out and about. She sings solo. She volunteers. She goes out. She goes out. She has boyfriends that she has fluctuating relationships with. She goes to dinner. She goes to movies. Basically, her activity level has not changed. He goes through very detailed the objective evidence, which of which there is minimal, that completely contradicts her statements of disabling ankle and back pain. Of particular note, Dr. Tobin, after hearing her complaints about what incredible pain she's still in, after months, kind of surreptitiously watches her walk outside and notices that when she doesn't realize that someone's watching her, she walks fine. That's also indicated in the physical therapist notes and also in the physical capacities evaluation that was taken whenever she was asked to do something that wasn't, explained that wasn't really incorporated into a work situation. If she was asked to bend over, let's say, she couldn't do it because of pain. She stopped. She just couldn't do it. But if she was asked to do something that incorporated those functions, she could do it because she wasn't conscious essentially that she should have pain at that point in time. So he goes through just numerous instances of this. There's, as I said, never an allegation that there is not evidence that hasn't been collected by the ALJ. There's no evidence that her hearing was cut short. It was a very long transcript of the hearing. Mr. Lowery was permitted to question all the witnesses he wanted, whether they were cumulative or not. Her testimony went incredibly long. So there was nothing that Mr. Lowery was not able to present or he was not presented for presenting the evidence. Mr. Lowery essentially gave the ALJ a reason to question the credibility of the evidence that Mr. Lowery was going to be presenting from then on, with good reason. When he found the Easton report, it was quite obvious that Dr. Easton also recognized basically her embellishment and her exaggeration and found that she had no psychological impairments. So the ALJ did what a judge is supposed to do, particularly one where the judge is the fact finder. And he looked at that and he critically evaluated all the evidence. And as they say in Litkey, impartiality is not gullibility. So although the decision may not have been the one that Mr. Lowery wanted, the ALJ afforded her every opportunity to present her case. Thank you.  Thank you. I do have one question because this has come up twice and I noticed the ALJ cites this back and forth on the alleged withholding of favorable or unfavorable information that the ALJ and the representative have of the claimant as well as I guess the administration of SSA have the obligation to fully develop the record. Now if that is true, is that true? I'm sorry, I'm not sure I understood the question. That the plaintiff also has the obligation? It says Social Security claimants, I'm reading from page 43 of the ALJ's statement. Council is reminded that it is the responsibility of both administrative law judges and duly appointed representatives to completely and fully develop evidentiary records and claims of Social Security disability benefits, a principle that has been frequently articulated in agency policy statements. Indeed, Social Security claimants' representatives routinely argue to the federal district courts that an ALJ's alleged failure to fully develop an evidentiary record constitutes a basis for a remand and so on. And he's invoking that to criticize Mr. Lowry for supposedly not doing due diligence, whatever, to produce unfavorable information. Is that, first of all, a true burden on claimants' counsel? No, not in that context. Mr. Lowry is correct that he does not have any positive, it's not the same as in a criminal case or a different civil case where each party is actually required to give everything as far as discovery. I cannot say that that is true. But what I think where the ALJ is coming from is that the claimant still has the burden of proof. It is the ALJ's job to make sure that all the evidence that's out there is brought before him. You see, the ALJ is spinning this whole beginning and singling out Mr. Lowry for not doing due diligence, going back and coming up with any documents or records in his possession that are favorable or unfavorable to the claimant. He recites this colloquy, which I don't think we need to get into. But what troubles me is if, in fact, the ALJ's point of view is that the claimant's counsel wasn't forthcoming, and then we have the argument made here that, indeed, as ALJ Madden points out, the argument made that when he decides, that is, when the ALJ decides that the lay witness information or the other information isn't adequate, he isn't. That is, the ALJ isn't holding himself to the same standard he was holding Mr. Lowry to, under this rubric of developing the medical record as completely as possible. Well, and I think the ALJ probably does step off a little too far. I'm not going to deny that. I don't think that it reaches the level of bias. The ALJ has the ultimate duty to make sure that the record is complete. However, the claimant also has the duty to make sure that they meet their burden. I'm not sure I'm explaining this correctly. Basically, the ALJ, I guess I would relate it to the concept of recontacting a physician. That's where it comes up. Right. There's kind of a conflict here because you have the regulations and rules that say you do have to recontact the physician in certain points in time. However, that's not every time. That is balanced against the Rollins case that tells us that you don't have to recontact just because there's a problem or there's things that are missing. You can evaluate evidence based on certain different factors, such as inconsistencies, or there's a lack of objective evidence. Let me sharpen it. Here, the argument in this case is made because the expert on Freeman, the argument by Mr. Lowry is that the ALJ, before rejecting his findings because there weren't any clinical reports, their clinical findings to support it, should have recontacted in that case. But that would be incorrect because the reason there weren't any is because they didn't exist. They didn't exist. So it's not the ALJ's job to send her back to him. But in a situation, because the other part of it is not an unfamiliar circumstance, where the ALJ is looking at the record and has decided that he or she doesn't believe the claimant's subjective evaluations and then turns around and uses that to impeach the weight given to the medical professional who has based his or her opinion on discussions with the claimant. It seems to me there's a... There is kind of a disconnect. I understand there's an awkward position, but on the other hand, these are medical people who, part of their profession, in fact, Senator Cornyn invoked his ability to tell whether somebody was telling the truth or not based on his 20 years as a physician. So I assume doctors think that their evaluations are entitled to some weight and then they're cut off without repenting. So that's my problem. There is sort of a disconnect that you have to, I guess, meld together. The ALJ is not required to recontact always. It's required to recontact if there's ambiguities within the record or if the evidence as a whole is not substantial enough to... I'm not saying that correctly. If the evidence as a whole is not sufficient in order to make a disability finding. So if the only doctor who presented an opinion was Dr. Freeman and he renders these opinions and there's absolutely no clinical evidence, then something probably needs to be done. But, for instance, I guess the one... Okay, I'm remembering the case. And Dr. Tobin is probably the one that exemplifies this the best. Dr. Tobin, throughout his treatment of her, basically says she's exaggerating. He doesn't understand how she can be in so much pain and watches her when no one's looking limp off. However, in one of his reports, he decides that she can't stand any longer than 15 minutes. Well, it's not necessary for the ALJ to recontact him to have him explain it because everything else in his record just doesn't support that. So I guess that's how the two of them kind of meld together. I have one question for you. Sure. You say you agree that the ALJ, quote, stepped too far. And reading page 3 of his opinion, page 43 of the record, it does appear to me to be saying that Mr. Lowry had an affirmative obligation to come up with evidence of lack of disability. Now, my question to you is this. Is there any claim that you can point to via the petitioner that this misapprehension of the duty of representative or claimant's attorney via the ALJ has a causal connection to him blocking out some of the petitioner's testimony or giving greater weight to some of the commissioner's testimony based on a suspicion that there was something showing lack of disability, which Mr. Lowry didn't come forward on? That's kind of a long question, but was it prejudice? That's basically my point in my briefing, is that there is no evidence whatsoever in the record of that occurring. And that's, as I said, evidence by the fact that there is a 45-page opinion that addresses every single piece of evidence. And whether Mr. Lowry agrees with ALJ's Madden's evaluation of the evidence or even this court agrees with the evaluation of the evidence, if his evaluation is reasonable and there is evidence to support that position, then there's discretion. We essentially have the citations that he's shown with the five different examples of how ALJ kind of snits with him a little bit. It just doesn't raise it a level. And the evaluation was just so voluminous of every piece of evidence that it just can't be said in this case.  Counsel, you have some time for rebuttal. Thank you, Your Honor. I wasn't expecting this, so I... Well, you don't have to say anything. We have the briefs and the records. But as this drug on, I thought maybe you would be giving me some time. At page 910 in the transcript, I wrote a letter to Judge Madden about the Easton questionnaire, and I think that speaks for itself. One of the things opposing counsel referred to was the judge relied on all the activities of the claimant in dating, going to movies, going to the coast, and whatnot. Nowhere does he either inquire in the claimant or say in his decision how often she did these things, what the activities involved in terms of the physical or mental demands made on her to do that, how long the activities lasted. It's kind of like it's all treated like a flat lump, and we don't inquire into the quantity or quality of what happened. We simply note that these things occurred, and that's good enough to deny the claim. I would suggest that you have to do more than that. You have to look into how often did it happen, how long did it last, what all was involved, what demands were made by the nature of those activities. If she went out once a week or once a month, she did those things. But if you don't know how often they happened, how long they lasted, what all was involved, select. Thank you. All right, thank you. Thank you, counsel, for your argument. Case is argued and submitted.
judges: Fisher, Gould, Bea